## Sherwood, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued October 4, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Herbert B. Cohen,* for appellants.

*Harris J. Latta, Jr.,* Assistant Counsel, with him *Albert E. Luttrell,* Assistant Counsel and *Lloyd S. Benjamin,* Counsel, for appellee.

*L. K. Connell,* with him *Violet H. Meehan,* for intervening appellee.

OPINION BY ERVIN, J., November 15, 1954:

This is an appeal from an order of the Pennsylvania Public Utility Commission granting The Pennsylvania Railroad Company the right to abandon all passenger train service between Lancaster, Lancaster County, and York, York County. At approximately the same time the Commission, by order, authorized Pennsylvania Greyhound Lines, Inc., an affiliate of the Railroad Company, to operate a substituted bus service for the rail service on substantially identical time schedules, with identical termini and substantially identical intermediate stops.

The facilities involved consist of a single track branch line railroad extending from Lancaster to York, a distance of 24.7 rail miles. Existing rail service is furnished by a self-contained self-propelled Diesel electric car with a capacity of 66 passengers, acquired in 1931, placed in this service in 1935 and completely rebuilt in 1948. A similar car is held in reserve. The substituted bus is a modern inter-city, air-conditioned highway coach, equipped with comfortable reclining seats and three baggage compartments beneath the bus proper, one of which is in the rear of the bus, extending across its entire width. There are seven racks inside on each side of the bus, each rack being 12 inches high, 22 inches deep and 38 inches in width. Arrangements have been made to furnish additional trips if the need arises. Extra drivers and buses are always available.

The City of York is located on the main line tracks of The Pennsylvania Railroad Company extending from Washington, D.C., and Baltimore, Maryland, to Harrisburg, at which latter point the line connects with the main line of the Railroad between New York City, Philadelphia and the West.

"Our scope of review on appeal is the same whether the Commission's order is a certification of new service or permits abandonment of existing public service. In either event, we determine whether there is error of law or lack of evidence to support the finding, determination, or order of the Commission, or violation of constitutional rights." *Commuters' Committee v. Pa. P. U. C.*, 170 Pa. Superior Ct. 596, 600, 88 A. 2d 420; *Pittsburgh & Lake Erie Railroad Co. v. Pa. P. U. C.*, 170 Pa. Superior Ct. 411, 415, 85 A. 2d 646.

"The jurisdiction of the Commission to grant certificates authorizing abandonment or curtailment of service by a public utility, as expressly granted under section 202 of the Public Utility Law, is clear. . . ." *New Castle v. Pa. P. U. C.*, 172 Pa. Superior Ct. 569, 571, 94 A. 2d 57.

"The question of whether such approval shall be given or withheld is an administrative one to be determined within the discretion of the commission." *Phila. & West Chester Traction Co. v. Public Service Commission*, 80 Pa. Superior Ct. 355; *Borough of Carlisle v. Public Service Commission*, 81 Pa. Superior Ct. 475.

"The weight to be given evidence and conflicts in testimony are matters exclusively for the commission, the fact finding body, to determine." *Lyons Transportation Co. v. Pa. P. U. C.*, 163 Pa. Superior Ct. 335, 337, 338, 61 A. 2d 362.

"We are not permitted to exercise our independent judgment, nor to weigh conflicting evidence." *Hutchison v. Pa. P. U. C.*, 168 Pa. Superior Ct. 319, 321, 77 A. 2d 744.

In this appeal there is no violation of constitutional rights or other error of law involved and, con-

10

sequently, the sole question at issue is whether the Commission's order and the findings therein are supported by substantial evidence with rational probative force in the record. *Arsenal Board of Trade v. Pa. P. U. C.,* 166 Pa. Superior Ct. 548, 72 A. 2d 612.

In *Commuters' Committee v. Pa. P. U. C.,* supra, we said that the following factors are to be considered: "(1) The extent of the carrier's loss on the particular branch or portion of the service, and the relation of that loss to the carrier's operation as a whole; (2) the use of the service by the public and the prospects as to future use; (3) a balancing of the carrier's loss with the inconvenience and hardship to the public upon discontinuance of such service; (4) the availability and the adequacy of service to be substituted."

The gross revenue received from passenger service on this branch line for 1951 was $41,344.00. The out-of-pocket operating expense was $87,823.00. These figures do not include the cost of any track, right-of-way, personnel other than the crew, and overhead. The out-of-pocket loss from the operation of passenger service on this branch is approximately $45,000.00 per annum or 51 cents per train mile. This branch has been losing money for a number of years in spite of the fact that it was operated by a Diesel electric rail car, which is the most economical type of equipment for such an operation. The loss from passenger service on the entire system is offset by freight revenues. However, the net return, after accrued depreciation on its investment in railroad property devoted to public use, varied from 1.45 per cent in 1947 to a high of 3 per cent in 1948 for the five years preceding the application. In *Commuters' Committee v. Pa. P. U. C.,* supra, the rate of return after accrued depreciation on its investment in railroad property varied from

4.63 per cent in 1945 to 3.58 per cent in 1950. In both of these cases the return is substantially less than has been allowed for other public utilities.

In *Commuters' Committee v. Pa. P. U. C.*, supra, at page 605, we said: "In arriving at an ultimate conclusion as to partial discontinuance of service, the entire system of the utility or carrier should be viewed as a unit. Philadelphia v. Pennsylvania Public Utility Commission, 164 Pa. Superior Ct. 96, 107, 63 A. 2d 391. The mere fact that a branch line fails to earn its estimated proportionate share is not sufficient to justify its abandonment; a test is whether the loss to the carrier is unreasonable under all the circumstances, having regard to the interests of the public as well as the utility. Borough of Carlisle v. Public Service Commission, 81 Pa. Superior Ct. 475, 481, 482; Chesapeake & Ohio Railway Co. v. Public Service Commission of West Virginia, 242 U. S. 603, 607, 608, 37 S. Ct. 234, 61 L. Ed. 520; Alabama Public Service Commission v. Southern Railway Co., 341 U. S. 341, 347, 71 S. Ct. 762, 95 L. Ed. 1002."

However, we are not unaware of the serious problem confronting the railroads in the loss of passenger service. In 1947 the Railroad Company here involved had a passenger service loss of $39,536,470.00 and by 1951 the annual loss had grown to $71,687,700.00. In 1946 the loss from railroad passenger operations in general throughout the United States was $139,700,-000.00 and in 1951 the loss had grown to the enormous sum of $615,500,000.00. The Interstate Commerce Commission has constantly called attention to the increasing deficits from passenger operations and has advocated that corrective measures be taken. In their 1949 annual report they said: "Abandonments of unprofitable train services or the substitution of motor services are steps in the right direction." 63rd

Annual Report I.C.C. November 1, 1949, p. 4.

In the case of *Atlantic Coast Line R. R. v. Public Service Commission,* 77 F. Supp. 675, 686 (E.D.S.C. 1948), the Court points out: "it is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed nor used by the public to any substantial extent."

Under the substituted bus service permitted by the Commission in this case the revenue will be approximately $42,000.00 and expenses about $45,000.00, leaving an out-of-pocket loss of approximately $3,-500.00.

The record indicates that an average of only about 15 passengers per trip made use of the rail facilities. Following the grant of temporary authority to Pennsylvania Greyhound Lines, Inc. on May 30, 1952, substantially the same number of passengers was carried by bus for those morning trips substituted for the rail service. The prospects of future use, at best, are for a continuation of existing patronage levels. The record in this case clearly justifies the conclusion of the Commission that no increase in future use of the facilities is in prospect. The substituted bus service is, for all practical purposes, identical with existing rail service. There has been no real curtailment of service. Under the circumstances revealed by the record in this case it would be confiscatory to require the Railroad to continue to furnish service at a substantial annual loss.

The complaints of the appellants and their witnesses largely related to such matters as inadequacy of luggage facilities, narrow aisles, lack of porter service at Lancaster station, lack of water and toilet facilities, and the steps in the Lancaster station. In the general commercial operations of Pennsylvania

Greyhound Lines, Inc. alone, this type of bus was operated 56,367,000 bus miles in 1952 and in that time carried 12,520,274 passengers. For the same year Greyhound, for its general commercial operations, sold at York a total of 55,307 tickets for transportation upon this type of bus. The baggage facilities have been entirely ample. There is no necessity for a passenger to take his or her baggage into the bus, because the driver will handle it and also assist the passengers in and out of the bus with their baggage. The porter at Lancaster has met every bus, except on Saturday and on Sunday, when baggagemen in Lancaster meet the bus. There are no toilet facilities or drinking water in the bus. Twelve million people a year are using Greyhound buses under similar conditions. The driver will upon request stop the bus at any one of the five intermediate station stops. This particular operation involves only 25 miles and is accomplished in 50 minutes and no person should have any difficulty under these conditions.

The steps at the Lancaster station are the same as those which the people of Lancaster have to use. The charge that motor transportation is more hazardous than rail transportation is not well founded. Based on the reports of the National Safety Council and based on a record of 100 million passenger miles, for the years 1947 to 1951, the fatalities on the entire Greyhound Lines, which includes all the Greyhound companies operating in the continental United States, were .18 per 100 million miles. On all the bus lines in the United States, regardless of ownership, the fatality rate was .20. During the same period the fatality rate was .28 on all railroads, and 1.64 on all scheduled airlines in the United States and 2.20 for private automobiles and taxis in the United States.

It would be most unfair to compel the consumers (who in the end pay the freight charges on the goods carried) to subsidize the passenger service on this branch line under all of the circumstances of this case.

The finding by the Commission that abandonment of the passenger train service and the substitution of bus service were in the public interest is amply supported by the record, and in view of the factors involved, the Commission's finding was entirely within the area of administrative discretion. We repeat what was said in *Borough of Carlisle v. Public Service Commission*, supra: "But the public support of a branch or line may be so utterly inadequate, irrespective of its effect on the rest of the system, and so lacking in prospects of ultimate betterment, as to justify the conclusion that the public necessity for it no longer exists and that its continued operation is not required for the convenience and accommodation of the public. . . ." We also repeat what was said in *Commuters' Committee v. Pa. P. U. C.*, supra: "It is scarcely necessary to say that abandonment by a carrier of train service on a part of its system without substituted service may present a different problem than that which was before the Commission in this case."

The order of the Commission is affirmed.