## Pittsburgh Railways Company, Appellant, v. Pennsylvania Public Utility Commission.

Argued November 18, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Clyde A. Armstrong,* with him *Charles M. Thorp, Jr., William D. Sutton, V. W. Thomas, E. B. Wolfe,* and *Thorp, Reed & Armstrong,* for appellant.

*Albert E. Luttrell,* Assistant Counsel, with him *Owen B. McManus* and *Paul Ribner,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for appellee.

*John R. Rezzolla, Jr.,* with him *Joseph J. Laws, George M. O'Hora,* Counsel, *Joseph L. Donnelly,* Deputy Attorney General and *Herbert B. Cohen,* Attorney General, for Department of Highways, intervening appellee.

*David Stahl,* Assistant City Solicitor, with him *J. Frank McKenna, Jr.,* City Solicitor, for City of Pittsburgh.

*Fred T. Ikeler, David McNeil Olds* and *Reed, Smith, Shaw & McClay,* for Pennsylvania Tunnel Commission.

OPINION BY RHODES, P. J., January 17, 1956:

This is an appeal by Pittsburgh Railways Company from an order of the Pennsylvania Public Utility Commission approving the construction of certain highway-railroad and street railway crossings involved in the construction of a proposed bridge across the Monongahela River and within the City of Pittsburgh. The Department of Highways of the Commonwealth of

Pennsylvania filed an application on May 25, 1954, seeking commission approval of such crossings located on the southwesterly side of the Monongahela River. The proposed bridge to be constructed by the Department of Highways, and designated as the Fort Pitt Bridge, is to be eight hundred feet upstream from the present Point Bridge across that river.

The proposed Fort Pitt Bridge is to extend in a general southwesterly direction across the Monongahela River from a traffic interchange in the Point Park area of the City of Pittsburgh to the northerly portals of a proposed tunnel to be known as the Fort Pitt Tunnel on the southwesterly side of the river. The bridge and tunnel will be integral parts of the new Penn-Lincoln Parkway, designated as state highway route 766. The new highway will extend from Churchill Borough, which is approximately nine and one-half miles east of downtown Pittsburgh, through the City of Pittsburgh to the Point Bridge interchange. From the latter point it will cross the proposed Fort Pitt Bridge and pass through the Fort Pitt Tunnel and continue in a westerly direction for a distance of approximately ten miles to the Airport Parkway. This project will have twelve interchanges at strategic locations along the nineteen and one-half miles of its length.[1] The bridge will carry U. S. traffic routes 22 and 30 across the Monongahela River, from the Point Park area; at the present time they cross the river on the Point Bridge, a county bridge. The Fort Pitt Bridge, according to the general plans, will be a double deck structure with four traffic lanes on each level; and there will be approach ramps on both the northeasterly (downtown or central Pittsburgh) and the southwesterly (West Carson Street)

---

[1] The above description of the Penn-Lincoln Parkway is from the brief of the Pennsylvania Public Utility Commission.

sides of the Monongahela River. The eastbound Parkway will occupy the upper deck and the westbound Parkway will occupy the lower deck. The approaches to the northerly portal of the proposed tunnel will converge, reaching the same elevation at the tunnel entrance.

The Parkway, after crossing the river on the proposed Fort Pitt Bridge, will cross, above grade, the tracks of the Pittsburgh and Lake Erie Railroad Company and the tracks of the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company (Pennsylvania Railroad Company). The plans also provide for the construction of two ramps, A and B. Ramp B, consisting of two traffic lanes, will extend along the southerly side of West Carson Street between the said street and the tracks of the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company from a connection with West Carson Street immediately west of the existing Point Bridge to a connection with the Parkway eastbound on the upper deck of the proposed Fort Pitt Bridge. This ramp, to be used by eastbound traffic, will curve easterly to meet the new bridge, crossing above West Carson Street and the tracks of the Pittsburgh and Lake Erie Railroad Company. Ramp A, also consisting of two traffic lanes, will extend along the northerly side of West Carson Street, generally parallel with ramp B from a connection with West Carson Street to a connection with the Parkway westbound on the lower deck of the new bridge. This ramp will be a westbound off-ramp curving to meet the new bridge and crossing above the tracks of the Pittsburgh and Lake Erie Railroad Company.

At present there are two street railway tracks of the Pittsburgh Railways Company located in the bed of West Carson Street. According to the general construction plans, these are to be removed from that por-

tion of West Carson Street east of the existing Point Bridge. The plans make no provision for the replacement of the tracks in that portion of West Carson Street which is to be reconstructed. Although these tracks are not presently used in rendering passenger service, they provide the only means of reaching the Homewood car barns and maintenance shops where all street railway cars used in service on the southwesterly side of the river are repaired and maintained by the Pittsburgh Railways Company. The plans make no provision for street railway tracks on ramps A and B leading to the proposed Fort Pitt Bridge.

The tracks of the Pittsburgh Railways Company now cross the Monongahela River on the Point Bridge. Seven trolley routes cross the Point Bridge; the average number of daily trips is 620, 310 inbound and 310 outbound. There is a maximum peak hour traffic of 31 trolleys in each direction. The Point Bridge furnishes the connection for street car service between downtown Pittsburgh and the area to the west and southwest. According to the record, this suburban area has an aggregate population of 100,000, and comprises such sections of Pittsburgh as Duquesne Heights, West End, Sheraden, and East Carnegie, and such boroughs as Crafton, Ingram, McKees Rocks, and Heidelberg.

Hearings were held on the application of the Department of Highways on December 9, 1954, and on January 11, 1955. Various public utilities appeared as interested parties as well as the City of Pittsburgh and the County of Allegheny. Pittsburgh Railways Company appeared and opposed the granting of the application, and it filed a petition, dated December 31, 1954, with the commission requesting the commission to assume jurisdiction over the proposed Fort Pitt Bridge and the approaches on both ends thereof. The commission, on June 27, 1955, after oral argument, is-

sued its order approving the application, as filed by the Department of Highways with one modification, and denying the petition to increase the scope of the proceeding. On July 25, 1955, Pittsburgh Railways Company filed a petition for rehearing which was denied by the commission by order of September 6, 1955; it thereupon appealed to this Court on October 1, 1955, and presented a petition for supersedeas. By our order of October 15, 1955, hearing on the petition for supersedeas was directed to be heard at the time the appeal was listed for argument on the merits. Hearing on the petition for supersedeas and argument on the merits of the appeal were held on November 18, 1955; on November 22, 1955, we denied the petition for supersedeas.

Those portions of the commission's order of June 27, 1955, relating to other public utilities affected by this project and to allocation of costs are not involved in this appeal.

The Department of Highways and the City of Pittsburgh were permitted by this Court to intervene as parties appellee.

Before the commission the principal objections of Railways to the approval of the application of the department by the commission were that no provision was made in the plans for the present installation or later accommodation of street railway tracks on the new bridge and the approaches or ramps connecting the bridge with West Carson Street, and that the plans required removal of the existing tracks on a portion of West Carson Street extending eastwardly from the present Point Bridge.

In approving the application of the department, the commission required that provision be made for the reconstruction of the tracks and other facilities of Railways in West Carson Street, thus providing Rail-

ways with access to its Homewood car barns and maintenance shops.

As to the first objection by Railways, the commission in its order said: ". . . the record fails to establish any public need at this time for the construction of the street railway tracks on the said highway ramps [A and B] and that, on the contrary, the installation of these tracks on the ramps and the operation of the street railway facilities thereon would defeat the very purpose for which this vast highway improvement project is being undertaken, viz., the safe, convenient and uninterrupted flow of great volumes of motor traffic through and on the approaches to the central business section of the City of Pittsburgh." The commission further said: "The tracks and facilities of Pittsburgh Railways Company will remain, as at present, on the existing Point Bridge and on the approaches thereto. The applicant has not requested and nothing in the order shall be construed as granting approval of the abolition of the highway-railway crossings which would be involved in the removal of the existing Point Bridge."

On this appeal Railways' argument is apparently predicated on the assumption that the existing Point Bridge is to be demolished as part of the redevelopment plan upon completion of the Fort Pitt Bridge.

Railways not only contends that the plans and record disclose that the Point Bridge is to be removed upon completion of the Fort Pitt Bridge, but also that the Fort Pitt Bridge is to be a replacement of the Point Bridge, and that therefore Railways is entitled to have its facilities presently included on the new bridge, or at least to have the Fort Pitt Bridge and its approaches redesigned so as to permit the future inclusion of its facilities thereon. There is no indication that the facilities across the Monongahela River are not at the

present time entirely adequate for Railways' purposes.

Although supporting the commission's order as an intervening appellee, the department takes the position that the Penn-Lincoln Parkway, including the Fort Pitt Bridge and its approaches such as ramps A and B, is a limited access highway, and that the Secretary of Highways, by virtue of the Limited Access Highway Act of May 29, 1945, P. L. 1108, 36 PS §2391.1 et seq., is vested with exclusive jurisdiction over the kind and class of traffic which may use this limited access highway, and has the power to exclude the street railway traffic of Railways from the proposed Fort Pitt Bridge. In this connection Railways claims that the new Fort Pitt Bridge is to be both a limited access highway and a local replacement facility and as such must provide for both through and local traffic.

The commission points to section 409 (a) of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1179 (a), which provides that no highway shall be constructed across the facilities of any public utility without approval by the commission (see, also, *Wilkes-Barre v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 210, 63 A. 2d 452; *Atglen Borough v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 149, 100 A. 2d 138) ; and it makes reference to the provision of the law that the commission's order of June 27, 1955, which approved the construction of the highway-railroad and street railway crossings in connection with the construction of the new Fort Pitt Bridge by the department across the Monongahela River in Pittsburgh, may not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order, or violation of constitutional rights (section 1107 of the Public Utility Law of 1937, as amended, 66 PS §1437; *Pittsburgh and Lake Erie Rail-*

*road Company v. Pennsylvania Public Utility Commission,* 170 Pa. Superior Ct. 411, 415, 85 A. 2d 646).

The commission's approval of the department's application was in conformity with the Public Utility Law; its order was not capricious, arbitrary or unreasonable, and was supported by substantial evidence. See *St. Peter's Roman Catholic Congregation of McKeesport v. Pennsylvania Public Utility Commission,* 161 Pa. Superior Ct. 64, 67, 54 A. 2d 92. The power of the commission under section 409 of the Public Utility Law of 1937, as amended, 66 PS §1179, is extensive (*Atglen Borough v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 149, 151, 100 A. 2d 138), but its authority is not without limit (*Somerset County v. Pennsylvania Public Utility Commission,* 132 Pa. Superior Ct. 585, 1 A. 2d 806). Its determination that no public need was established for the construction of street railway tracks on the new highway ramps was in accordance with the record; and the question whether the affirmative action sought by Railways is beyond the power of the commission to grant, without acquiescence of the Secretary of Highways, does not arise. It is self-evident that, unless the construction of the Fort Pitt Bridge involves the removal of the Point Bridge over which Railways is now operating, there would be no need to place the facilities of Railways on the new Fort Pitt Bridge. The proceedings before the commission did not relate to the abolition or removal of the Point Bridge or seek approval of any such contemplated action. Moreover, it does not appear that the new bridge is to be a replacement of the Point Bridge,[2] or that Railways' operations will

---

[2] According to the plans, the only traffic on West Carson Street that will be able to use approach ramp B to the new bridge will be traffic moving west to east. On the existing Point Bridge, both east to west and west to east traffic are accommodated. The new

be affected in any manner by the construction of the new bridge except temporarily on West Carson Street.

The question whether or not the inclusion of street railway tracks on the new bridge and its approaches would defeat the purpose of the new project is a matter to be considered, if at all, only if the record discloses that alleged rights of Railways might be affected: (1) By the removal of the Point Bridge upon completion of the Fort Pitt Bridge and as an incident of its construction; and (2) by the fact that the Fort Pitt Bridge may be so designed that it would be impossible to include Railways tracks thereon at some future date.

A witness, the department's grade crossing engineer, testified that it would not require any change in the design of the Fort Pitt Bridge in order to put street car tracks on the bridge. It was emphasized, on oral argument before us, that street car tracks could be installed upon the Fort Pitt Bridge after completion without any change in its present design, although the cost of doing so at a later date would be somewhat higher than present cost due mainly to the fact that the roadways on two lanes must be removed and the bridge strengthened before the tracks can be installed.

Drawing 115 G-9 of the plans attached to the department's application to the commission contains on its face the following language: "South Pier-Point Bridge (To Be Removed)." This apparently relates to the construction of the ramp to the new bridge, and would not limit or control use of the Point Bridge. On the upper left corner of sheet 3 of the location map appear the words "To be removed" beneath the words "Point Bridge." The location map also shows the

Fort Pitt Bridge is designed to be a part of a new multi-lane expressway through the City of Pittsburgh.

Point Park area on the northeasterly side of the river devoid of streets. It is Railways' contention that without connecting streets the Point Bridge could not serve street car or other vehicular traffic and would not be retained exclusively for use by pedestrians. However, there is nothing to indicate its removal as an incident of the construction of the Fort Pitt Bridge, or when it would be removed and by whom.

The department's engineer testified on cross-examination that the language "Point Bridge To Be Removed" was included "Because it is the intention some time to remove the Point Bridge. It is not necessarily going to be removed with the construction of the Fort Pitt Bridge." He further testified that this language was directed to some future, unspecified date. In reply to the question whether it was contemplated by the department "that removal would occur in a not too far distant date," he stated: "Insofar as the Department of Highways is concerned, when the Fort Pitt Bridge is constructed, we will have no interest in the Point Bridge. The Point Bridge is a County project that now carries State Highway traffic and this traffic will be re-routed over the proposed Fort Pitt Bridge." The department, in preparing plans for the construction of the Fort Pitt Bridge, may have given some consideration to the possibility of the Point Bridge being removed some time in the future, but it also appears that the department will have no interest in the Point Bridge, a county bridge, after the completion of the new bridge.

Railways' exhibit B is a letter from the district engineer of the Corps of Engineers, U. S. Army, to the Department of Highways, which states in part as follows: "Reference is made to the conference held in this office 12 September 1952 at which representatives of the Commonwealth, Allegheny County, and the Con-

sulting Engineers agreed to inclusion in the Instrument of Approval [approving department's proposed plans] a special condition as follows: All parts of the existing 'Point' bridge over the Monongahela River shall be entirely removed to a depth of at least 19 feet below pool full or three feet below the bed of the river, whichever is the greater. The entire structure will be removed to the satisfaction of the district engineer, not later than one year after the new bridge and approaches have been completed and are serving the Penn-Lincoln Parkway with the tunnel, ramps, etc., in full operation.

"The Instrument of Approval was received from higher authority by this office before the inclusion of the above agreed condition could be recommended. The District Engineer would appreciate your acknowledgment of receipt of the Instrument indicating therein your acceptance of the additional special condition quoted above."

Railways' exhibit C is a reply by the Department of Highways to the above request, which states in part: "Your Instrument of Approval dated August 31, approving the location and plans of a free highway bridge across the Monongahela River at Pittsburgh, was given to the Pennsylvania Department of Highways while the existing 'Point' Bridge over the Monongahela River is under the control and jurisdiction of the County of Allegheny. The permit for the new bridge is separate and distinct from the existing structure as far as our Department is concerned, and we cannot accept responsibility to remove a structure as outlined above when that structure not only belongs to the County of Allegheny, but is subject to the rules and regulations of the Public Utility Commission of Pennsylvania by reason of the fact that it crosses railroads and is occupied by trolley tracks. We regret exceedingly we cannot accept the revision in the Instrument of Approval as suggested

by you." Railways claims that this clearly shows that the County of Allegheny, which controls the Point Bridge, has agreed with the Corps of Engineers, U. S. Army, to have the Point Bridge removed within one year after the new bridge is opened to traffic. We cannot agree with this contention. The only thing that is shown is that the Department of Highways, County of Allegheny, and the Corps of Engineers considered the inclusion of this provision for removal in the Instrument of Approval, and that this was never done.

Railways further contends that the commission has conceded the prospective removal of the Point Bridge by allowing the Bell Telephone Company to install facilities on the new Fort Pitt Bridge. We fail to see how permission to Bell Telephone Company to install its facilities on the new bridge shows that the Point Bridge is to be removed. The commission may have been strongly influenced by the fact that part of the facilities were to be installed within a pier of the new bridge, which could not be done at a later date.

The evidence fails to disclose that the Point Bridge is to be removed upon completion of the new Fort Pitt Bridge, or that it is ever to be removed. At most, the evidence shows that some thought had been given to the possibility of the eventual removal of the Point Bridge. But it is a fact, according to the evidence, that it would be possible to install Railways' facilities on the Fort Pitt Bridge in the future, although at a somewhat higher cost than if they were installed at the time of construction. In granting the application of the department on this record the rights of Railways are not adversely affected. Some of Railways' rights might be affected in the event of the future removal of the Point Bridge if Railways was then rendering street car service across the Monongahela River for the areas now being served. In the event of the proposed

removal or alteration of that bridge, thereby preventing rendition of service by Railways, proper application or protest could be made to the commission.

Railways claims the commission erred in denying Railways' petition of December 31, 1954, which requested the commission to take jurisdiction over the entire Fort Pitt Bridge project together with all its proposed approaches. It is Railways' contention that all parts of a bridge are "reasonably related" to each other and to the whole, and further, that the demolition of an existing bridge is "reasonably related" to the construction of a new replacement bridge. Railways' argument is again founded on the assumption that the Point Bridge is to be demolished upon completion of the Fort Pitt Bridge. The only purpose in seeking to have the commission expand its jurisdiction as requested would be to allow Railways to show the supposed contemplated destruction of the Point Bridge and the necessity for the present inclusion of Railways' facilities on the new bridge. While the commission did deny Railways' petition, nevertheless its order was based on all the facts shown in the record, and Railways was allowed to introduce into the record evidence which Railways hoped would show the proposed demolition of the Point Bridge as a part of the Fort Pitt Bridge project. Although the petition was denied, Railways was allowed to accomplish the purpose of the petition. Consequently, any formal enlargement of the inquiry would have been a superfluous act. We find no error in the commission's denial of the petition.

Railways assigns as error the commission's refusal to grant Railways a rehearing for the purpose of introducing evidence to prove that its trolley movements would not interfere in any respect with the flow of traffic on the new bridge. The grant or refusal of a petition for rehearing is a matter within the discre-

tion of the commission, and the commission's action will not be reversed unless a clear abuse of discretion is shown. *Byers v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 620, 109 A. 2d 232; *W. J. Dillner Transfer Company v. Pennsylvania Public Utility Commission (No. 2)*, 175 Pa. Superior Ct. 472, 107 A. 2d 164; *Yellow Cab Company v. Pennsylvania Public Utility Commission*, 161 Pa. Superior Ct. 41, 54 A. 2d 301. It is Railways' contention that the commission's finding that the installation of Railways' facilities on the Fort Pitt Bridge would defeat the very purpose of the highway improvement project, that is, the safe, convenient, and uninterrupted flow of great volumes of motor traffic through the City of Pittsburgh is unsupported by the evidence. However, in view of the fact that the commission's finding that there is no public need at this time for the construction of Railways' facilities on the new bridge is supported by the evidence, whether or not the presence of Railways' facilities would defeat the purpose of the project is not material at this time. There was no error in the commission's refusal to grant appellant a rehearing.

The order of the commission, in so far as it relates to the present appeal, is affirmed, at the cost of appellant.