## Philadelphia, Appellant, v. Pennsylvania Public Utility Commission.

Argued November 14, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

600

*William D. Valente,* Assistant City Solicitor, with him *David Berger,* City Solicitor, for appellant.

*Howard L. Criden,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

*Peter Platten,* with him *Hamilton C. Connor, Jr.,* and *Ballard, Spahr, Andrews & Ingersoll,* for applicant, intervening appellee.

*Thomas M. Hindman,* for School District of Cheltenham Township and Cheltenham Township School District Authority, intervening appellees, submitted a brief.

OPINION BY HIRT, J., February 11, 1958:

On December 13, 1956 Philadelphia Transportation Company (which we will refer to as the Company) filed an application with the Public Utility Commission at A83937, for leave to abandon service and facilities on the portion of Rail Route 6 between Cheltenham Avenue (Philadelphia City Line) and the village of Willow Grove to the north, in Montgomery County. In a second concurrent application at A59145, the Company sought the right to substitute bus service for

that of the abandoned street railway between Willow Grove and the City Line, and to continue the bus service from that point to the Broad Street Olney Avenue Subway terminal in Philadelphia. The two related applications were consolidated and public hearings were held on the combined applications during the months of March, April and June, 1957.

Both applications before the Commission were supported by resolutions of the Commissioners of Abington Township; by the School District of Cheltenham Township and by the State Highway Department. The township of Cheltenham, by resolution of its commissioners, went on record as not opposed to the applications and the County of Montgomery also indicated that it had no objection to the changes in service. In opposition to the applications, the Roman Catholic Archdiocese of Philadelphia filed a protest (which however was subsequently withdrawn on assurances from the Company that adequate transportation service would be provided for a proposed Diocesan School, when constructed, at Royal Avenue in Wyncote). There were objections directed specifically to the bus service, over Edgehill Road. The Glenside Board of Trade, with a membership of about 100, by letter indicated that it did not favor the proposed bus service as routed in the application. And a number of residents living on Edgehill Road joined in a petition and several of them appeared as witnesses in definite opposition to the change in service. The Abington Community Association with about 400 members, living on or near Edgehill Road also went on record as against the applications, as did the Parent Council of Highland Elementary School. The City of Philadelphia did not file a protest but at the hearing on March 5, 1957, on motion of its counsel, was given the

status of a protestant in this proceeding. It opposed the applications in toto at all of the hearings before the Commission.

The order of the Commission was filed on September 9, 1957. In the order the application of the Company for leave ". . . to abandon street railway service and facilities on that portion of street railway Route 6 Glenside-Willow Grove operating between an off-street terminal loop located on applicant's private property on Ogontz Avenue north of Cheltenham Avenue (Philadelphia City Line), Cheltenham Township, and the outer terminus of the route located on private property at or near the intersection of Easton Road and Moreland Avenue in the village of Willow Grove, Abington Township, all in Montgomery County, as shown on applicant's Exhibit 'A', . . ." a map of the section of the township affected, was granted, subject to the condition that the approval ". . . shall become effective only upon the beginning of motorbus service by the applicant as concurrently authorized at A59145 . . ." We are not concerned with other conditions imposed, which relate to practical implications of the abandonment. In the same order as consolidated the substitution of motorbus service over the route including Edgehill Road, as set forth in the application at A59145, was approved, subject to certain conditions relating to through service and the inclusion of the right to render shuttle service between points on the bus route, and the additional right to digress from the route to meet demands for special service.

At the close of the final hearing on June 27, 1957, by agreement of counsel the case was submitted to the Public Utility Commission on the record and on briefs but without oral argument. But after the order was

filed the city petitioned the Commission for a rehearing and *oral* argument, alleging the existence of newly discovered evidence. The Commission dismissed the city's petition on October 14, 1957. Thereupon the city and only the city intervening as a party in interest, took this appeal. The Philadelphia Transportation Company intervened as appellee. The appeals before us are from the consolidated order of the Commission approving both of the Company's applications.

The applications of the Company were filed in accordance with §202 (c and d) and §203 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended, 66 PS §§1122, 1123. Section 202(d) provides that upon approval of the Commission, evidenced by a certificate of public convenience a public utility may abandon its service in whole or in part. And under §202(c) upon like approval the utility may begin the exercise of an additional service (in the present case the substitution of bus service for the street railway service to be abandoned). Section 203 sets forth the procedure for obtaining Commission certificates of public convenience; the procedure there indicated was complied with in these proceedings.

In *Sherwood v. Pa. P. U. C.*, 177 Pa. Superior Ct. 6, 109 A. 2d 220 we reviewed the law applicable to appeals in this class of cases (under §1107 of the Public Utility Law, supra, 66 PS §1437) as follows: "Our scope of review on appeal is the same whether the Commission's order is a certification of new service or permits abandonment of existing public service. In either event, we determine whether there is error of law or lack of evidence to support the finding, determination, or order of the Commission, or violation of constitutional rights." No constitutional question is raised by the present appeal and the Commission can-

not be charged with error of law on this record. The controlling question therefore is whether the findings and the determination and order in each instance are sufficiently supported by competent evidence.

Route 6 is an important transportation artery. Its total length from the Olney Subway Terminal in Philadelphia to Willow Grove is about 9½ miles, three miles of which are within the city limits. Route 6 as a street railway is presently operated by the company over its own private right-of-way in Montgomery County for 5.6 miles, and over public highways for the remaining distance of about 1 mile, between the city line and Willow Grove. It is the most important feeder for the Broad Street Subway at its terminal at Olney Avenue. It carries more than one million paying passengers each year. The substituted bus service as approved by the order will operate over public highways from Willow Grove to the city line in Cheltenham Avenue, and from that point the regular route of the bus line will be over Cheltenham Avenue and Broad Street to the Olney terminal, with part time service over an alternate route on Ogontz Avenue paralleling the part of the street railway service which will be continued.

In the approach to the validity of the Commission's conclusion "that approval of the instant applications is necessary or proper for the service, accommodation, convenience or safety of the public" (§203 of the Law, 66 PS §1123) it may be helpful to consider the grounds upon which the applications were protested. The City contended that the conversion to buses, although beyond the city line, will adversely affect the remaining railway service on Route 6, within the city, in that: (1) it will eliminate a power source by the abandonment of the Glenside Station located north of the city

which has powered the entire railway Route 6. It is contended that the remaining 3 miles of rail Route 6, which will continue to operate inside the city will have to look to the Chelten Station for power, located one and one-half miles away in Germantown; and it is the city's position that this source of power will be inadequate especially during peak hours because of other demands upon it by other railway transportation within the city. (2) The bus route as approved includes Edgehill Road for a distance (not disclosed by the record) of perhaps two miles. Edgehill Road is a State Highway but at the time of the hearings was in a state of disrepair to some extent generally, and the paved portion of the road was but 16 feet wide; moreover the shoulders were not to grade and otherwise were unimproved. It was contended that a cartway but 16 feet wide did not provide sufficient clearance for buses to pass each other, or to pass other vehicles especially trucks, in safety. (3) It was contended that the abandonment of the railway route, for the most part over a private right-of-way, and the substitution of bus service will make for unnecessary further congestion on roads and highways already overburdened with traffic; and that for this reason also the change from street railway to motorbus service, in this exceptional instance, is not in the best interest of the public. In addition the city contends that the contemplated reduction in the frequency of service by 17% in day operation and 33% in "owl" operation will adversely affect the public interest. In general it is the position of the city that the evidence *as a whole* is legally insufficient to show public convenience or necessity under the rule of *Modern Tr. Co. et al. v. Pa. P. U. C.*, 179 Pa. Superior Ct. 46, 52, 53, 115 A. 2d 887. The protests of individuals and some of the

groups also go to the routing of bus service over Edge-hill Road. The objections of others are general in character. There was also the belated application of Wyncote Hills Association to join the protestant group and the city in its petition for a rehearing.

The Commission's order contains a review of all of the material testimony which it accepted as a basis for its order. The Company contended that the substitution of bus service was in the direction of modernization of its present facilities, making for more flexible operation. An Assistant Executive Vice-President of the Company testified that the present railway service provides 246 round trips each day and that the scheduled substituted bus service contemplates 207 trips which will continue to supply about the same quality of service. The Company's Director of Planning testified that the operation of buses will shorten the running time between the termini of the route. The Company's interest was also in savings which would result from the changeover. This witness estimated the annual saving in operation costs to be about $52,600. There is other testimony of a vice-president of the Company under whose direction a survey had been made of the track facilities of the railway between the City Line and Willow Grove. He testified that he spot checked the survey for accuracy and that it "indicated that during the next ten year period we would be faced with rehabilitation of a considerable portion of the tangent track and also the special track work along route 6 north of City Line. [And that he] . . . had that translated in terms of cost to just a few hundred dollars more than $1,000,000 over the next ten year period or approximately $100,000 a year. Of that $100,000 a year approximately 70% would be chargeable to capital expenditures, the other 30% would be

chargeable to operating expense." J. W. Borce, who had had long experience with the Company as Superintendent of Power, testified that the elimination of the power substation at Glenside would not adversely affect the new service for the reason it no longer will be needed. According to his testimony power can be furnished by a station other than Chelten if necessary. However, in his judgment, based to some extent upon a Data Sheet of Voltage Readings dated March 1, 1957, taken every 15 seconds at the trolley loop at Ogontz Avenue and City Line, he concluded that the railway service between Cheltenham Avenue and the Olney Street terminal would be adequately supplied by the Chelten substation alone. "The weight to be given evidence and conflicts in testimony are matters exclusively for the commission, the fact finding body, to determine": *Lyons Transp. Co. et al. v. Pa. P. U. C.*, 163 Pa. Superior Ct. 335, 337, 338, 61 A. 2d 362. From the testimony of this witness the Commission was justified in finding that no insuperable power difficulties will result from the discontinuance of the Glenside substation.

Admittedly Edgehill Road, in its condition at the time of the hearings, was not adapted to bus transportation service. But that road is a part of a State Highway and the State Highway Department appeared and undertook to proceed at once to widen the paved portion of Edgehill Road to the full width of 20 feet. And the Department also agreed to put the entire highway, including the regrading of the shoulders, in safe condition for motor traffic. The Highway Department indicated also that it would construct a new bridge over Reading Railroad with weight bearing capacity, sufficient for the substituted bus service, of 20 tons. The Commission approval of substituted service in this

case contemplates the employment of buses limited in width to 96 inches, and there is abundant testimony in the present record to the effect that buses of that size will operate efficiently and safely on Edgehill Road when improved by the State Highway Department as planned. The objections of the witnesses who reside in Abington Township on Edgehill Road and of the groups of other citizens on the above ground, are thus removed, especially in the light of the undertaking of the Company as stated of record by its counsel "to adopt a route that is satisfactory" if Edgehill Road when improved should not prove acceptable. In recognizing that the Commission's order must be affirmed because supported by sufficient competent evidence, we are reassured by the attitude of two townships in the affected area and the County of Montgomery as well as a township school district all of which publicly indicated that they would not oppose the applications. Sensitive to public opinion, as these bodies are, their stand uncriticized by the citizens within their borders, as far as indicated by this record, must have had its proper weight with the Commission in its determination that the applications should be granted in the public interest.

The only irrevocable part of the consolidated order is the authorization of the abandonment of about 6½ miles of street railway service. As to all other matters made the subjects of protests, going principally to the character of the proposed bus service, it should be borne in mind that the Commission will have continuing jurisdiction over the substituted bus service of the Company. In its original application to the Commission the Company stated: "6. Applicant is financially able to provide adequate service to the public over the proposed bus route." And at the hearings in

this case the Company stood willing to do all things necessary from time to time to accomplish that result. We may take the Company at its word as to its intention to comply with the directions of the Commission in the future as to changes in the character of the service to be supplied, the routes over which the buses will operate, including divergences which may be necessary to give service to the communities involved.

And this finally: After the order of September 9, 1957, the city petitioned the Commission to reopen the proceeding and grant a rehearing and *oral* argument. The petition alleged questions of law, for the most part, which are identical with those raised in the present appeal. The factual matters, alleged to have come to the attention of appellant since the final order, are not within the class of after discovered evidence which would justify the reopening of the proceeding. Evidence of all of the additional facts, referred to in the petition, was available at the time of the hearings in this case. But more important still, proof of the facts alleged would not change the result. As a general rule in matters before the Commission a petition for a rehearing may be refused where it is not apparent that the evidence which the petition states would be offered was not available at the hearings in the proceeding. *Byers v. Pa. P. U. C.*, 176 Pa. Superior Ct. 620, 109 A. 2d 232. The grant or refusal of a petition for a rehearing is a matter within the discretion of the Commission and the Commission's action will not be reversed unless a clear abuse of discretion is shown. *Pittsburgh Rwys. Co. v. Pa. P. U. C.*, 180 Pa. Superior Ct. 201, 119 A. 2d 804; *Dillner Trans. Co. v. Pa. P. U. C. (No. 1)*, 175 Pa. Superior Ct. 461, 481, 107 A. 2d 159. Even if the truth of all of the city's averments of additional facts be assumed the Commission

could not be charged with abuse of discretion in refusing the rehearing.

We may not assume that the Highway Department of the State has completed the widening of the cartway and that the other contemplated improvements, on Edgehill Road, have been made as ordered also by the Commission. And as a condition to affirmance of the order, in establishing its effective date, it will be necessary for the Commission to so find, after further hearing or upon stipulation of counsel; a supersedeas is granted which will be effective in the meantime.

As so limited the order is affirmed.