457 F.2d 381
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of STATE OF NEW YORK and T. W. Parker, Commissioner
of Transportation of the State of New York.
T. W. PARKER, Commissioner of Transportation of the State of
New York, Appellant,
v.
PENN CENTRAL TRANSPORTATION COMPANY.
 Nos. 71-1799, 71-1916.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 9, 1971.
Decided March 17, 1972.
As Amended March 23, 1972.
 
 Thomas F. Harrison, New York City, for appellants.
 Donald A. Brinkworth, Philadelphia, Pa., for appellees-trustees.
 Gordon P. MacDougall, Sp. Asst., Washington, D. C., for appellees, Commonwealth of Pa., Pa. Public Utility Comm. and City of Philadelphia.
 Hanford O'Hara, I. C. C., Washington, D. C., for appellee, I. C. C.
 Before VAN DUSEN and JAMES ROSEN, Circuit Judges, and LAYTON, District Judge.
 OPINION OF THE COURT
 JAMES ROSEN, Circuit Judge.
 
 
 1
 This case is here on appeal from Order No. 377 of the United States District Court for the Eastern District of Pennsylvania ("Reorganization Court") insofar as that order refuses to extend as a preliminary injunction the terms of a temporary restraining order requiring the Trustees of Penn Central Transportation Company ("Debtor") to continue operating eight passenger trains between New York City and Chatham, New York.
 
 
 2
 Penn Central was required by Order No. 232 of the Reorganization Court to request leave of that court before discontinuing any intercity passenger trains covered by the Rail Passenger Service Act of 1970 (P.L. 91-518, 84 Stat. 1327, 45 U.S.C. Sec. 501 et seq.). After posting the Notice of Discontinuance required by the Act and by the Interstate Commerce Act, 49 U.S.C. Sec. 13a, the Trustees petitioned the Reorganization Court to discontinue all of their intercity passenger train service, including the eight trains running between New York City and Chatham, New York. Certain cities and states appeared to contest the intercity nature of these trains, and on April 30, 1971 the Court, without objection from the parties, referred the question to the Interstate Commerce Commission by Order No. 244, see In re: Penn Central Transportation Company, 329 F.Supp. 572 (E.D.Pa.1971). Concurrently, the court entered Order No. 245 which restrained the Trustees from discontinuing the New York to Chatham train service pending the initial determination and report to the Court by the Commission. The Commission entered an investigation and held hearings in Millerton, New York and New York City, and on June 29, 1971 announced its finding (Finance Docket 26633) that the New York-Chatham service is not "commuter or other short-haul service" as that term is defined in the Rail Passenger Service Act, and that the trains in question are intercity trains within the meaning of that Act. Ten Commissioners participated in the decision with three dissenting from the majority report. On July 14, 1971, by Order No. 322 in the Reorganization proceedings the District Court extended Order No. 245 until 11:59 P.M. on August 2, 1971. A final extension was granted by Order No. 377 until 12 o'clock noon on September 7, 1971. It is from this order that the instant appeal has been taken. A stay was granted by this Court on September 3, 1971.
 
 
 3
 The trains involved basically provide a service inbound to New York in the morning and outbound to Chatham in the late afternoon, with an additional train from New York to Chatham on Friday evening and from Chatham to New York on Sunday evening. Generally, the equipment on the trains consist of a diesel locomotive and standard coaches.
 
 
 4
 This is not the first attempt by Penn Central to discontinue service on the New York to Chatham run. New York State's Department of Transportation denied a previous application to abandon the northern portion of this intrastate rail line. Until passage of the Rail Passenger Service Act of 1970, supra, ("Amtrak Statute"), it would have been necessary for Penn Central to petition the Interstate Commerce Commission for authority to effect a discontinuance once its application was denied by New York.[1] However, the Amtrak Statute provided for the establishment of a National Railway Passenger Corporation, which was authorized to enter into and tender contracts upon request to existing railroads in order to relieve them of their responsibility to provide intercity rail passenger service. Any railroad entering into such a contract would be relieved of further responsibility in operating such service provided that it complied with the notice requirements contained in section 13a(1) of Title 49.[2] Penn Central informed both the District Court and the Commission that such a contract had been entered into with the directors of the National Rail Passenger Corporation, so that, if the passenger service operated by it between New York and Chatham is intercity the Debtor would bear no responsibility for the continued operation of that line, once it had observed the aforementioned notice requirements.
 
 
 5
 Sec. 102(5) of the Rail Passenger Service Act, 45 U.S.C.A. Sec. 502(5), defines "intercity rail passenger service" as all rail passenger service other than
 
 
 6
 "(A) commuter and other short-haul service in metropolitan and suburban areas usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations . . ."
 
 
 7
 In concluding that the service between New York and Chatham was intercity and not commuter and short-haul service, the Commission relied on certain standards developed by it to assist in the definition of "commuter and other short haul service." Penn Central Transp. Co. Discon. or Change in Serv., 338 I.C.C. 318 (1971).[3] The Commission found such standards to be necessary where the nature of its function was essentially that of statutory interpretation, and the statute in question (Amtrak Statute) defined "intercity service" only in a negative sense. The issue before it was stated to be not the need for the service, but the character of the service actually being rendered. While admitting that the record was replete with evidence of need, the Commission considered that evidence only insofar as it shed "considerable light upon the kind of service that the trains are providing for those who use them."[4]
 
 
 8
 Several characteristics of normal commuter operations were found to exist in the service provided by Penn Central on the New York-Chatham line: "the small stations, many little more than shelters, would be recognized on any commuter line, and the frequency of stops and the short distances between them, are not inconsistent with services which are clearly commuter in nature." However, the commission believed that a balanced view of all the relevant criteria afforded sufficient basis for the conclusion that the service is not "commuter or other short haul service" as that term is defined in the Railway Passenger Act. The decision was made on alternative grounds: "In our view, then, the New York-Chatham service fails the first test, and is not commuter or short haul service of the kind which is excluded from the provisions of the Rail Passenger Service Act, because it is not performed within a single metropolitan area or between such an area and its suburbs. It is not necessary, however, to rely solely on an interpretation of this particular statutory language. The service itself cannot, we think, be characterized as commuter or short haul service as we have defined it in the past."[5]
 
 
 9
 The parties briefed the validity of the agency reports in F.D. No. 26632[6] and F.D. No. 26633, but the cases were never scheduled for final disposition in the Reorganization Court. The court merely continued certain prior orders with respect to other passenger service which Penn Central had sought to discontinue, while declining to continue injunctive relief for the Chatham-New York service, thereby precipitating this appeal.
 
 
 10
 The critical question is whether the district court abused its discretion in denying a preliminary injunction, for New York recognizes that the district court has not actually ruled on the validity of the I.C.C. report in the Chatham-New York case.
 
 
 11
 It is well settled that the issue on appeal from an order denying a preliminary injunction is whether the district court abused its discretion. The appellants have the burden of showing an abuse of discretion by the District Court Judge, and any direct attack on the merits of the Commission report is clearly improper and beyond the legitimate scope of this appeal. The standards which govern the issuance of a preliminary injunction in a public utility case6a are set forth in Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Essentially they are:
 
 
 12
 1. Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal;2. Has the petitioner shown that without such relief it will be irreparably harmed;
 
 
 13
 3. Would the issuance of the stay substantially harm other parties interested in the proceedings;
 
 
 14
 4. Where lies the public interest.
 
 
 15
 Measured against these standards enumerated in Virginia Petroleum Jobbers, supra, and later in Congress of Railway Unions v. Hodgson, 326 F.Supp. 68 (D.C.1971), the evidence presented by appellants is insufficient to show an abuse of discretion by the district court in refusing to grant a preliminary injunction. The main thrust of appellants' argument is made against the weight of the evidence to support the Commission's finding. As stated above, a direct attack on the Commission's decision is premature and improper; furthermore, the arguments advanced by appellants afford no basis for a showing of likelihood of success in the Reorganization Court.[7]
 
 
 16
 In addition, appellants have not shown that they will be irreparably injured. The Commission was not able to find a single person from the northern portion of the line who used the services daily. It further found that the pattern of use demonstrated on the record combined with the scheduling "suggests that this is not a peak-hour service." (Finance Docket No. 26633, at 12). With regard to the southern portion of the line, a memorandum of intent has been circulated between the railroad and the Metropolitan Transit Authority (MTA) which would allow the MTA to take over service on the lower portion of the Harlem Division line. However, the railroad intends to offer additional service if the trains involved here are discontinued even if the MTA does not take over, in an effort to supplement service over the lower portion of the route which it considers to be commuter to make up for the loss of the service. It has not been alleged at any time that discontinuance of the New York-Chatham service will have a deleterious impact on the economic health of the areas serviced. In fact, the briefs of the Appellants are silent with regard to the likelihood of irreparable harm, except in alleging the importance of continuity of service. Consequently, the court below did not abuse its discretion when measured against the standard of irreparable harm.
 
 
 17
 Appellants have also failed to show that other parties interested in these proceedings will not be substantially harmed. An affidavit was attached to the Trustees' reply to appellants' motion for stay in the district court which set forth the annual loss suffered by Penn Central in operating the New York-Chatham service. On a direct-cost basis, the annual loss was stated to be in excess of $172,000, while on a full-cost basis this cost runs to $317,000 per year. The daily loss is thus computed to be approximately $472 a day on a direct-cost basis and $870 a day on full-cost basis.
 
 
 18
 The appellants answer that Penn Central has repeatedly asserted that it plans to continue service south of Dover Plains (about 50 miles below Chatham), so that the abandonment of the subject trains would not result in any savings in labor costs. No breakdown was presented by either side of the relative cost percentages attributable to labor and operations. The appellants insist that labor costs remain the same whether the line is discontinued or not, and that the added operational costs are minimal. No evidence is offered to support the contention. Without such evidence, the argument of appellants does not rise above the level of speculation. Therefore, it cannot be said that Penn Central will not be harmed by the injunctive relief sought below.
 
 
 19
 It has become painfully apparent that the condition of the nation's railroads is eroding daily. Services are being cut back, existing services are deteriorating, and the availability of working capital has become critically limited. Reacting to an ever worsening rail-passenger crisis, Congress enacted the Rail Passenger Service Act of 1970, supra. The Committee on Interstate and Foreign Commerce, in its Report No. 91-1580 on the Rail Passenger Service Act of 1970, stated:
 
 
 20
 "The basic purpose of this bill is to prevent the complete abandonment of intercity rail passenger service and to preserve a minimum of such service along specific corridors."
 
 
 21
 The Act directed the Secretary of Transportation to designate a so-called "basic system" of intercity rail passenger service for the whole country and envisaged that passenger service over any lines not included in the basic system would be discontinued. The legislative history of the Act and the findings therein make clear that Congress regarded as imperative the timely implementation of the Act. Neither the Secretary of Transportation nor the National Rail Passenger Corporation have found it necessary to designate this particular line as part of Amtrak. The Congress and the Commission recognized that passenger trains would be discontinued on May 1, 1971.
 
 
 22
 This Congressional concern for the preservation of a basic rail system is not recent. Both the Transportation Acts of 1920[8] and 1940[9] were attempts at consolidation of railway properties in the Continental United States into a limited number of systems. The Interstate Commerce Commission was authorized to exercise exclusive and plenary power over rail mergers. The Transportation Act of 1958[10] authorized the Commission to guarantee loans to railroads up to a specified amount.[11] Throughout the fabric of such legislation there is the ever-present public interest. In the view of the Supreme Court, "the public interest is served by economy and efficiency in operation," New York Central Securities v. United States, 287 U.S. 12, 23, 53 S.Ct. 45, 47, 77 L.Ed. 138 (1932). It is beyond dispute that remedial legislation is given liberal construction in order to effectuate its purposes. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The Amtrak Statute is designed specifically for the purpose of consolidation and preservation of a basic intercity rail system. By subjecting the decision of the Secretary of Transportation and the Commission to the narrow considerations heretofore applied in rail discontinuance cases involving intrastate lines, the objectives of the Amtrak Statute would be seriously undermined. In fact, the burden on interstate commerce created by state reluctance to grant discontinuance in proper cases prompted Congress to enact Sec. 13a(2) of the Interstate Commerce Act.[12] The House Report to the bill which eventually became sec. 13a(2) clearly indicates that Congress was primarily concerned with the problems posed by passenger services for which significant public demand no longer existed and which were consistently deficit producing, thus forcing the carriers to subsidize their operation out of freight profits.[13]
 
 
 23
 In looking at the extent of the traffic on the Chatham line, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant circumstances, we are convinced that the district judge did not abuse his discretion, and that the public interest supports the denial of the preliminary injunction.
 
 
 24
 Finally, we find that the district court did not err in retaining jurisdiction of the suit. This court has previously decided that it was proper for the Reorganization Court to retain control of litigation involving these matters and specifically Order No. 232. In the matter of Penn Central Transportation Company, Debtor v. Congress of Railway Unions & Railway Labor Executives Association, 446 F.2d 1109 (1971).[14] Appellants have failed to present to either the Reorganization Court or this court sound reason for transferring this litigation to another judge in the United States District Court for the Eastern District of Pennsylvania.
 
 
 25
 The stay entered by this court is vacated immediately and that part of Order No. 377 of the district court from which this appeal is taken will be affirmed.
 
 
 
 [1]
 Section 13a(2) of the Interstate Commerce Act, 49 U.S.C. Sec. 13a(2), provides in pertinent part:
 (2) Where the discontinuance or change, in whole or in part, by a carrier or carriers subject to this chapter, of the operation or service of any train or ferry operated wholly within the boundaries of a single State is prohibited by the constitution or statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such an application or petition within one hundred and twenty days from the presentation thereof, such carrier or carriers may petition the Commission for authority to effect such discontinuance or change. The Commission may grant such authority only after full hearing and upon findings by it that (a) the present or future public convenience and necessity permit of such discontinuance or change, in whole or in part, of the operation or service of such train or ferry, and (b) the continued operation or service of such train or ferry without discontinuance or change, in whole or in part, will constitute an unjust and undue burden upon the interstate operations of such carrier or carriers or upon interstate commerce. When any petition shall be filed with the Commission under the provisions of this paragraph the Commission shall notify the Governor of the State in which such train or ferry is operated at least thirty days in advance of the hearing provided for in this paragraph, and such hearing shall be held by the Commission in the State in which such train or ferry is operated; and the Commission is authorized to avail itself of the cooperation, services, records and facilities of the authorities in such State in the performance of its functions under this paragraph. Feb. 4, 1887, c. 104, Pt. I, Sec. 13a, as added Aug. 12, 1958, Pub.L. 85-625, Sec. 5, 72 Stat. 571.
 
 
 [2]
 45 U.S.C. Sec. 561(a) (1). See Quincy College and Seminary Corp. v. Burlington Northern, Inc., 328 F.Supp. 808 (N.D.Ill.1971), aff'd, 405 U.S. 906, 92 S.Ct. 939, 30 L.Ed.2d 777 (summary affirmance of February 22, 1972)
 
 
 [3]
 a. The passenger service is primarily being used by patrons traveling on a regular basis either within a metropolitan area or between a metropolitan area and its suburbs;
 b. The service is usually characterized by operations performed at morning and evening peak periods of travel;
 c. The service usually honors commutation or multiple-ride tickets at a fare reduced below the ordinary coach fare and carries the majority of its patrons on a reduced fare basis;
 d. The service makes several stops at short intervals either within a zone or along the entire route;
 e. The equipment used may consist of little more than ordinary coaches;
 f. The service should not extend more than 100 miles at the most, except in rare instances; although service over shorter distances may not be commuter or short haul within the meaning of the exclusion.
 
 
 [4]
 On the limited administrative role of the Commission in referral matters, see Locust Cartage Co. v. Trans American Freight Lines, 430 F.2d 334 (1st Cir. 1970)
 
 
 [5]
 F.D. No. 26633, at 11-12
 
 
 [6]
 In addition to the proceeding involved here, the Reorganization Court referred two other "commuter-intercity" matters to the Commission for decision, one involving certain trains running between Philadelphia and Harrisburg (Finance Docket No. 26632) and the other involving certain trains running between Philadelphia and New York City (Finance Docket No. 26634). In both cases the Commission found the service involved to be "commuter."
 6a Generally, the standards for a preliminary injunction are set forth in Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc., 376 F.2d 543 (3d Cir. 1967); Ikirt v. Lee National Corp., 358 F.2d 726 (3d Cir. 1966).
 
 
 [7]
 The Interstate Commerce Commission has argued that the district court's referral in Order No. 244 rendered the Commission's decision arising out of that referral reviewable solely by the Reorganization Court under 28 U.S.C. 1336(b) and 1398(b) and that because the Commission has exercised its primary jurisdiction the district court may not modify or set aside this decision (i. e., that the trains operated by Penn Central between New York City and Chatham, N.Y. constitute "intercity rail passenger service" within the meaning of section 102(5) of the Rail Passenger Act of 1970), if it is based upon adequate findings and is arrived at by proper application of the relevant legal standards. However, we need not decide the difficult issues raised by this argument (See, e. g., Locust Cartage Co. v. Trans American Freight Lines, 430 F.2d 334, 341 (1st Cir. 1970), cert. denied 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383, 1970), because (a) the instant appeal is only from the district court's denial of a preliminary injunction and the scope of the district court's review of the Commission's finding is only indirectly relevant as bearing on the petitioner's likelihood of success on the merits, and (b) we find that the district court did not abuse its discretion in denying the request for a preliminary injunction even if the Commission is incorrect in its evaluation of the effect of the referral by the district court
 
 
 [8]
 Feb. 28, 1920, c. 91, 41 Stat. 456
 
 
 [9]
 Sept. 18, 1940, c. 722, 54 Stat. 898
 
 
 [10]
 Aug. 12, 1958, P.L. 85-625, 72 Stat. 568, 49 U.S.C. Secs. 1231, 1233
 
 
 [11]
 The aggregate principal amount of all loans guaranteed by the Commission was not to exceed $500,000,000
 
 
 [12]
 "A most serious problem for the railroads is the difficulty and delay they often encounter when they seek to discontinue or change the operation of services or facilities that no longer pay their way and for which there is no longer sufficient public need to justify the heavy financial losses entailed. The subcommittee believes that the maintenance and operation of such outmoded services and facilities constitutes a heavy burden on interstate commerce." S.Rep. No.1647, 85th Cong.2d Sess., 21
 
 
 [13]
 H.R.Rep. No. 1922, 85th Cong. 2d Sess., 11-12
 
 
 [14]
 We note that this case has been recently docketed for consideration by the United States Supreme Court (No. 71-689, filed November 22, 1971). A subject matter summary appears in 40 L.W. 3307. The questions presented are: (1) Does enactment of Rail Passenger Service Act of 1970 now permit railroad reorganization court to exercise complete control over passenger train continuances and discontinuances? (2) Has Rail Passenger Service Act of 1970 preempted methods formerly utilized to discontinue service of passenger trains? We note that since the opinion in the instant case was filed, cert. was denied in 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 787 (1972)