In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re DISCONTINUANCE OF INTER-CITY PASSENGER SERVICE.

CITY OF PHILADELPHIA, COMMON-WEALTH OF PENNSYLVANIA, et al., (Party Plaintiffs),

v.

George P. BAKER et al.

T. W. PARKER, Commissioner of Transportation of the State of New York,

v.

PENN CENTRAL TRANSPORTATION COMPANY.

COMMONWEALTH OF PENNSYLVANIA et al., Plaintiffs,

v.

George P. BAKER et al., Defendants.

Civ. A. Nos. 71–1002, 71–1003 and 71–2301.

United States District Court, E. D. Pennsylvania.

Jan. 23, 1974.

Blank, Rome, Klaus & Comisky by Edward W. Stern, Philadelphia, Pa., Sp. Counsel to the Trustees, Penn Central Transportation Co.

Donald A. Brinkworth, Pittsburgh, Pa., for Penn Central Transportation Co.

Tate & Ervin, by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Herbert Smolen, Asst. City Sol., for City of Philadelphia.

Edward A. Harvey, and Drinker, Biddle & Reath by R. Philip Steinberg, Philadelphia, Pa., for SEPTA.

Dechert, Price & Rhoads by Matthew J. Broderick, Philadelphia, Pa., for Penn Central Co.

Gordon P. MacDougall, Washington, D. C., for Commonwealth of Pa.

Herman A. Gray, New York City, for Harlem Valley Transp. Assn., Dutchess and Columbia Counties, N. Y. and Berkshire County, Mass.

Thomas F. Harrison, Asst. Atty. Gen., of N. Y., for State of N. Y.

## OPINION

FULLAM, District Judge.

Pursuant to the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 et seq., the Debtor no longer provides, or is required to provide, intercity rail passenger service. Since May 1, 1971, all such service has been provided by Amtrak, by means of contracts entered into with various rail carriers, including the Debtor.

Various aspects of the implementation of the Amtrak statute have been the

subject of litigation in this Court. Final decision of certain issues has been deferred pending decision of closely related issues by the Supreme Court of the United States. The Supreme Court has now spoken, National Railroad Passenger Corporation v. National Association of Railroad Passengers, —— U.S. ——, 94 S.Ct. 690, 38 L.Ed.2d 646, (1974), and it is appropriate that the pending litigation in this Court now be brought to a close.

The procedural background is somewhat complicated. It will be reviewed here only to the extent that such review may help clarify precisely what is being decided.

Before the Trustees had reached a final decision as to whether to participate in the Amtrak program, the Commonwealth of Pennsylvania and various other parties brought an action in the United States District Court for the Western District of Pennsylvania, seeking injunctive relief against the threatened discontinuance of certain trains. This Court, by Order No. 232, stayed this litigation, and enjoined all further litigation of issues relating to the Debtor's intercity passenger service, except such litigation as might be brought in this District. At the same time, in order to allay the fear that discontinuance of such service might be attempted in violation of the Amtrak statute, I also enjoined the Trustees from effecting any such discontinuance, except pursuant to an order of this Court entered after at least five days' notice.

Thereafter, having entered into an approved contract with Amtrak, the Trustees petitioned this Court for leave to discontinue all intercity passenger service. Certain parties, principally the Commonwealth of Pennsylvania and its Public Utility Commission, the City of Philadelphia, the State of New York and the State of New Jersey, opposed the Trustees' request, in certain particulars hereinafter discussed. Concurrently, many of these same parties filed suit in this District, Civil Action Nos. 71–1002 and 71–1003, seeking to enjoin the Trustees from discontinuing certain trains. The cases were consolidated for hearing.

The parties objecting to the discontinuances contended that the notices of proposed discontinuance, promulgated by the Trustees and scheduled to become effective on May 1, 1971, were premature, and could not be made effective on that date; and that the notices were not in compliance with the Amtrak statute. They further contended that certain service proposed to be discontinued by the Trustees was not "intercity" service within the meaning of the statute, and therefore could not be discontinued by the Trustees.

On April 30, 1971, I filed an Opinion (D.C., 329 F.Supp. 572) holding that the notices were timely and in accordance with the statute, and that the question of whether certain service was "intercity" or otherwise would be referred to the Interstate Commerce Commission for its recommendation and report. Thereafter, the ICC filed its recommendations and report, and the Commonwealth of Pennsylvania and other parties filed a separate action in this District, seeking "implementation" of the ICC "order." (C.A. 71–2301.) The State of New Jersey intervened, the Interstate Commerce Commission was brought upon the record, exceptions and motions to dismiss were filed, and extensive briefing followed.

The particular services in question, and the present status of each, follows:

1. *New York City to Chatham, New York.* This was not included in the Amtrak contract. The ICC found that this was "intercity" rather than "commuter" service. With the approval of this Court (unnecessary under the statute, but required by the terms of the earlier Order (No. 232) of this Court), the Trustees discontinued this service at the end of the summer of 1971, and this Court's refusal to compel continuation was upheld on appeal, as equivalent to a denial of a preliminary injunction, In re Penn Central Transportation Co., ap-

peal of State of New York, 457 F.2d 381 (3d Cir. 1972).

2. *York, Pennsylvania Substituted Bus-for-Rail Service.* The ICC concluded that this service was not within the terms of the Amtrak statute, which the Commission interpreted as applying only to intercity rail service, not substituted bus-for-rail service. This service is being operated at the present time.

3. *The 600 Series of Trains Between Philadelphia and Harrisburg, Pennsylvania.* This service is included in the Amtrak contract. However, the Commonwealth of Pennsylvania and other parties contend that this is really commuter service, and should be the responsibility of the Debtor, subject to discontinuance only with the approval of the Public Utilities Commission (or of the ICC under § 13 of the Interstate Commerce Act). The ICC report concluded that this is "back-to-back" commuter service, rather than "intercity" service.

4. *The 200 Series of Trains Between Philadelphia and New York.* This service is included in the Amtrak contract. The ICC report concludes that this is "commuter" service, rather than "intercity" service. The State of New Jersey contends that operation of these trains by Amtrak is in derogation of the rights of the State of New Jersey pursuant to certain contracts with the Debtor and others for commuter service in that State.

## I.

■■ It is important at the outset to emphasize certain distinctions apparent in the scheme of the Amtrak statute. The "basic system" designated by the Secretary of Transportation is "not reviewable in any court" (§ 202). Amtrak's right to operate trains constituting a part of the "basic system" cannot be questioned in any court, or in any administrative proceeding; conversely, Amtrak must continue to operate such trains unless and until it seeks and obtains the permission of the ICC to discontinue them. In addition to the "basic system," Amtrak has the right to operate other intercity passenger trains, on a more or less experimental basis. These "additional" or "excess" trains may be discontinued by Amtrak at any time, in its sole discretion. However, any train which is operated by Amtrak continuously for a period of two years or more automatically becomes part of the "basic system" and subject to ICC abandonment control

The foregoing principles are applicable on the assumption that the trains in question are "intercity" trains. Beyond defining, in a rather imprecise way, what is meant by "intercity" passenger service, the statute is silent on such matters as: How and by whom is the determination to be made as to whether a particular train or group of trains constitute "intercity" or other service? Is this determination reviewable, and if so, where? What are the standards of review?

The litigation which resulted in the recent decision of the Supreme Court in National Railroad Passenger Corporation v. National Association of Railroad Passengers, *supra*, provides some answers, and some clues to other answers, but does not completely and explicitly resolve the present controversies. Two related, but distinct, cases were before the Court of Appeals: one involved a discontinuance by Amtrak of certain intercity trains constituting "excess" service, rather than a part of the "basic system." This was the only case to reach the Supreme Court. The Court held that § 307 of the Amtrak statute, which authorizes the Attorney General to bring suit for violation of the statute, precludes all such litigation by other parties. In its simplest terms, the holding of the Court was that, by virtue of the Amtrak statute, no one other than the Attorney General has a cause of action against Amtrak or against any railroad, for violations of the statute or actions inconsistent with the provisions of the statute. The Court intimated that the same result would be reached on "standing"

principles. The determination of the Court of Appeals that such suits could be maintained by private parties was reversed.

The other case decided by the Court of Appeals, but not by the Supreme Court, was an attempt by private litigants to enjoin the proposed discontinuance of certain rail service which had not been assumed by Amtrak. Plaintiffs in that case asserted that the service in question was commuter in nature, and thus not governed by the Amtrak statute; whereas the railroad argued that it was "intercity" service and could properly be discontinued since it had not been assumed by Amtrak. The Court of Appeals held that the District Court had jurisdiction to determine this issue, and remanded the case for appropriate determination. The Court of Appeals expressed no view as to the merits, nor even as to the proper procedure to be followed in reaching a decision (*i. e.*, whether through referral to the ICC, or by the Court independently).

As mentioned above, this Court has referred the definitional issues to the Interstate Commerce Commission and has received the reports and findings of the Commission. This was done at the request of most of the parties, and without opposition from anyone. For this reason, the precise nature of the referral has never been specified, and the parties remain free to argue, as some of them do, that neither the ICC nor this Court has jurisdiction, and that the referral was improper, or that the findings and report of the Commission are merely advisory.

II.

In deciding that only the Attorney General could bring suit for infractions of the Amtrak statute, the Supreme Court relied not only upon the language of the statute (which it held would normally be interpreted to produce that result) but upon the legislative history, which, in the view of the Court, very clearly demonstrated the Congressional intent that, in order to salvage intercity rail passenger service, Amtrak must be free to use the streamlined procedures of the Amtrak statute in ridding itself of uneconomic lines. It was felt that the obvious purposes of the statute would be frustrated if Amtrak (and the railroads performing functions under the Amtrak statute) were subject to suit by private litigants.

The precise legal issue which plaintiffs sought to raise in that case was whether Amtrak, by contracting with a wholly-owned subsidiary railroad, could relieve that subsidiary of its obligation to provide intercity rail passenger service, in the absence of a contract with the parent. Both the Court of Appeals and the Supreme Court viewed the case as challenging a termination of service pursuant to the Amtrak statute, rather than as asserting that the termination was a violation of the Interstate Commerce Act, or some other statute or regulation.

In the companion case in the Court of Appeals, in which Supreme Court review was not sought, Amtrak itself was not directly involved. The B & O Railroad sought to discontinue certain trains which Amtrak had not agreed to be responsible for, and the plaintiffs sought to obtain a declaratory judgment that such discontinuance was a violation of other regulatory statutes, since the trains in question were "commuter" rather than "intercity." The Court of Appeals held that, while the District Court did not have jurisdiction to enjoin the discontinuance (that being essentially a state cause of action), it did have jurisdiction to render a declaratory judgment as to whether the service was or was not "intercity" within the meaning of the Amtrak statute.

 In my judgment, the rationale of the Supreme Court opinion requires that a distinction be made in the present case between those trains which are actually being operated pursuant to an Amtrak contract, and those trains which are not covered by an Amtrak contract. Given the clear Congressional intent to enable Amtrak to fashion and operate a viable system of intercity passenger service,

the Court held, it follows that private litigants are not to be permitted to interfere with the performance of that function. The fulfillment of Amtrak's role depends as much upon the service which it does provide as upon its ability promptly to terminate uneconomic service. If no one but the Attorney General may sue to prevent Amtrak from discontinuing a train, surely no one but the Attorney General should be allowed to sue to compel Amtrak to surrender a particular service.

In short, Congress has effectively precluded judicial review of Amtrak's characterization of specific trains as constituting "intercity" passenger service. With regard to such trains as form a part of the "basic system," the denial of judicial review has been made explicit in § 202 of the Act. With regard to "additional" service furnished by Amtrak, the reasoning of the Supreme Court in the *National Rail Passenger* case, *supra*, would seem to preclude judicial review at the suit of anyone but the Attorney General, at least so long as the service is being provided by Amtrak. Whether there may remain a residual cause of action which might later be asserted by private litigants against railroads in the event of unilateral termination of such service by Amtrak seems doubtful but in any event need not be decided now. Amtrak has contended in this litigation that both the 200-series and the 600-series of trains have been part of the "basic system" from the beginning. The parties have devoted much argument to the precise definition of the "basic system," a question as to which the statute is not altogether clear.[1] But since both series of trains have now been in operation pursuant to the Amtrak contract for more than two years, both series are undoubtedly now a part of the "basic system," and possible future discontinuances can result only if author-ized by the ICC pursuant to § 13 of the Interstate Commerce Act.

I therefore decline to consider whether the ICC had jurisdiction to characterize these trains as "commuter," or whether such characterization was correct.

Different principles are applicable to contests over the discontinuance of trains which are not being operated under an Amtrak contract. To the extent that these provide intercity service, it is clear that the Amtrak statute permits immediate discontinuance by the carriers. Indeed, it would be a violation of the Amtrak statute for any carrier which has entered into a contract with Amtrak to provide intercity passenger service, except pursuant to its Amtrak contract (§ 401(c)). But it is equally clear that the Amtrak statute does not apply to commuter trains, and was not intended to alter the legal requirements, both substantive and procedural, which railroads must meet before discontinuing commuter service. The Amtrak statute does not provide a mechanism for determining which of a railroad's non-Amtrak passenger service is "commuter" and therefore must be continued. But this, of course, does not mean that Congress intended that such disputes could never be resolved.

It is correct that the successful assertion by state or local private litigants that certain trains are "commuter," and cannot be discontinued, can have a substantial impact upon Amtrak's operations. But Amtrak itself has standing to intervene in any such litigation and defend its position. The Attorney General would presumably have little interest in attempting to establish that a particular non-Amtrak service is "commuter" and therefore must be continued. In the unlikely event that a railroad insisted upon operating an "intercity" train by labeling it "commuter"

---

1. One problem is whether the "basic system" consists of sets of terminal points between which service is to be offered (*i. e.*, "lines on a map"), or the actual trains to be operated between such points. Another issue is whether trains which travel only part way between the designated terminal points are "basic" trains.

service, presumably both Amtrak and the Attorney General would have a cause of action under the Amtrak statute to prevent such violation of that statute. But, at least in cases in which neither Amtrak nor the Attorney General perceives any threat to Amtrak's operations, other parties which do have an interest in the determination must have standing to obtain such a determination, and a forum.

## III.

 Plaintiffs in Civil Action Nos. 71–2301 and 71–1002 requested the convening of a three-judge court, on the theory that 28 U.S.C. § 2325 is applicable. That statute requires a three-judge court in cases involving an application for

"an interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission."

That statute does not apply to the present case, since no "order" of the Commission is involved, and no injunction restraining enforcement of such an order is sought. The ICC itself has pointed out that no orders have been entered by the Commission, and that its reports are purely advisory in character. Finance Docket 26632 and 26634.

Moreover, in cases referred to the Commission pursuant to 28 U.S.C. § 1336(b), it is clear that "the court which referred the question or issue shall have exclusive jurisdiction" over any subsequent review of the Commission's action. *See* also 28 U.S.C. § 1398(b). The cases of Keller Industries, Inc. v. United States, 449 F.2d 163, 167 (5th Cir. 1971) and International Transport, Inc. v. United States, 337 F.Supp. 985 (W.D. Mo.1972) are further authority for denying the application for a three-judge court.

This Court's previous determination that, because of this Court's continuing jurisdiction over Debtor's contract with Amtrak, litigation over discontinuances in connection with implementation of the Amtrak statute should be confined to this District, has been upheld on appeal, In re Penn Central Transportation Co., Appeal of Congress of Rwy. Unions, et al., 446 F.2d 1109 (3d Cir. 1971), and the Third Circuit has also held that there is no basis for transferring this litigation to another judge. In re Penn Central Transportation Co., Appeal of State of New York, 457 F.2d 381, at 387 (3d Cir. 1972).

## IV.

### A. *The Chatham, New York to New York City Service.*

As noted earlier, this Court, in the reorganization proceedings, as a precautionary measure, enjoined the Trustees from discontinuing any passenger service except as might be permitted by this Court after five days' notice to all interested parties. The primary purpose of this Order (No. 232) was to make certain that, unless and until a contract between the Debtor and Amtrak was approved by this Court, after due notice and hearing, the *status quo* would be preserved. After the Amtrak contract was approved, this Court granted the Trustees' application to discontinue all intercity passenger service (specified in the Trustees' application) except in those few instances where opposition was expressed on the theory that the particular service was "commuter" rather than "intercity." Those cases were referred to the ICC for recommendation and report.

In the Chatham case, the ICC found that the service was indeed "intercity," rather than "commuter," and this Court thereupon dissolved the temporary injunction and authorized the discontinuance. The Court of Appeals viewed the case as one in which this Court had declined to grant a further preliminary injunction against the discontinuance. Finding that the State of New York had not demonstrated a likelihood of ultimate success on the merits, and that the potential for irreparable harm if the trains were discontinued was outweighed by the irreparable harm the Debtor would have suffered if the discontinu-

ance had been enjoined, the Court of Appeals affirmed. In re Penn Central Transportation Co., Appeal of the State of New York, *supra.*

Unlike the Pennsylvania litigants, the State of New York has not filed any separate plenary action challenging the ICC determination, but has relied upon the presentation it made, in the reorganization proceeding and in C.A. No. 71–1003, in opposition to the Trustees' request for leave to discontinue the trains. In fairness, it must be said that the procedural approach adopted by the State of New York is in accord with my own views of the procedural setting.

It is clear that the record is complete. In order to remove any doubt about finality, I now expressly find that the trains in question, which provided passenger service between Chatham, New York and New York City, were "intercity" trains within the meaning of the Amtrak statute, and were not "commuter" trains. A declaratory judgment to that effect will be entered, and the papers filed on behalf of the State of New York in opposition to the Trustees' application for leave to discontinue the trains will be treated as an application for an injunction against such discontinuance. A final order will be entered, denying the requested injunction.

The Amtrak statute defines "intercity rail passenger service" as meaning

" . . . all rail passenger service other than (A) commuter and other short-haul service in metropolitan and suburban areas, usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations, and (B) [auto ferry service] . . . ." 45 U.S.C. § 502(5).

In an earlier proceeding, Penn Central Transportation Co. Discontinuance or Change in Service, 338 ICC 318, 326 (1971), the Commission announced certain criteria to be used in applying the statutory definition. These are:

"(1) The passenger service is primarily being used by patrons traveling on a regular basis either within a metropolitan area or between a metropolitan area and its suburbs;

"(2) The service is usually characterized by operations performed at morning and evening peak periods of travel;

"(3) The service usually honors commutation or multiple-ride tickets at a fare reduced below the ordinary coach fare and carries the majority of its patrons on such a reduced fare basis;

"(4) The service makes several stops at short intervals either within a zone or along the entire route;

"(5) The equipment used may consist of little more than ordinary day coaches;

"(6) The service should not extend more than 100 miles at the most, except in rare instances; although service over shorter distances may not be commuter or short-haul within the meaning of the exclusion."

The Commission found that, applying these criteria, the Chatham service was not "commuter." The Commission's findings are clearly supported by substantial evidence. I am persuaded that the findings are correct. If the matter were before me *de novo*, I would reach the same conclusions, and would do so irrespective of the allocation of the burden of proof. Thus, under any view of the matter, the decision previously reached should be made final.

Some further comment may be appropriate. The criteria promulgated by the Commission appear to be consistent with the statutory definition. The Commission has apparently experienced little difficulty in successfully applying these criteria to particular factual situations, recognizing, of course, that the criteria represent guidelines, rather than inflexible standards. As applied in the present case, while train service between Chatham and New York City may not, strictly speaking, be service between

two distinct metropolitan areas, neither can it be regarded as service between a metropolitan area and its suburb. The distance involved, and the other characteristics of the service, militate against a "commuter" label.

It can be argued that the Commission's finding in the Chatham case is inconsistent with its finding in the 600 series, Philadelphia to Harrisburg, case. However, in the latter, the Commission admittedly injected a new approach, in attempting to characterize service between two relatively distant cities as "back-to-back" commuter service. The validity of this approach is questionable, but that issue is not before the Court, as discussed above. In any event, there would seem to be little similarity between the Chatham service and the Philadelphia to Harrisburg service.

B. *Substituted Bus-for-Rail Service Between York, Pennsylvania and Lancaster, Pennsylvania.*

On May 30, 1952, the Pennsylvania Public Utility Commission, on a temporary basis, authorized Pennsylvania Greyhound Lines, Inc. to operate bus service in substitution for the rail service theretofore furnished by the Pennsylvania Railroad between York and Lancaster, Pennsylvania, a distance of about 24.7 miles. As of November 9, 1953, the PUC authorized discontinuance of the rail passenger service between York and Lancaster. Docket No. 78915; aff'd Sherwood, Appellant v. Pennsylvania Public Utility Commission, 177 Pa.Super. 6, 109 A.2d 220 (1954).

On January 14, 1963, the PUC authorized the Conestoga Transportation Company, pursuant to an agreement with the railroad, to take over that bus service, and Greyhound then discontinued its local service (but continues to perform the long-distance service between the two cities).

On the theory that this service was, in reality, merely a substituted method of providing transportation for rail passengers between the two cities (*i. e.,* that this service was part of the Debtor's intercity passenger service, which was not being assumed by Amtrak), the Trustees gave notice of proposed discontinuance, pursuant to the Amtrak statute.

Although noting that, on the average, each of these busses carries only 3.7 paying passengers per trip, the ICC report concluded that such discontinuance could not be achieved pursuant to the Amtrak statute. The decision rests upon an extremely narrow and technical interpretation of the statute. It is noteworthy that the Commission did not find that this was "commuter" service, or that it was not a part of the Debtor's intercity passenger service. The decision rests entirely upon the following reasoning:

There is nothing in the Amtrak statute, or in its legislative history, which expressly covers substituted bus-for-rail service. Section 401(a)(1) of the statute provides that any railroad "discontinuing a train" must give notice in accordance with the procedures of § 13(a)(1) of the Interstate Commerce Act, and § 13(a)(1) of the Interstate Commerce Act governs notices pertaining to trains and ferries, New Jersey v. New York S & W Ry. Co., 372 U.S. 1, 83 S.Ct. 614, 9 L.Ed.2d 541 (1963). Since notice cannot be given pursuant to § 13(a)(1) of the Interstate Commerce Act, the discontinuance of this bus service would have to occur without any officially approved notice. And since there is no suggestion that Congress intended to authorize discontinuances without notice, it must follow that Congress did not intend, in the Amtrak statute, to authorize discontinuances of services such as the York to Lancaster bus-for-rail service.

I cannot accept the ICC's reasoning, but I reach the same result on somewhat broader grounds (perhaps intended to be a basis for the ICC decision, although seemingly not expressed therein): New Jersey v. New York S & W Ry. Co., *supra,* shows that even the commonly understood remedial purposes underlying a statute cannot justify a

court in supplying statutory provisions which have been omitted from the enactment. That case involved the proposed discontinuance of substituted bus-for-rail service which formed a link in the undoubtedly interstate movement of passengers by railroad. The issue was whether the discontinuance could be accomplished pursuant to § 13(a)(1) of the Interstate Commerce Act, permitting streamlined abandonment proceedings for interstate situations, or whether the abandonment must proceed pursuant to § 13(a)(2) of the Act, governing intrastate matters. The Supreme Court, although noting the remedial purpose behind the 1958 amendment to the Act, nevertheless adhered to a literal reading of the statute and held that, even though the busses traveled from a point in New Jersey to a point in New York, their discontinuance did not fall within § 13(a)(1), which provides for "the discontinuance . . . of the operation or service of any train or ferry operating from a point in one State to a point in any other State."

Although the question is not free from doubt, I have concluded that there is nothing in the Amtrak statute or its history which permits a different result here. Accordingly, the Trustees will be required to obtain the approval of the Pennsylvania Public Utility Commission before discontinuing the York to Lancaster bus service.

## V.

Certain issues related to the position of the State of New Jersey in this litigation remain for discussion.

By Order No. 134, entered January 25, 1971, the State of New Jersey was permitted to intervene as a party in the reorganization proceedings. As such, it was duly notified of the hearings on the Trustees' petition for authorization to enter into a contract with Amtrak. Hearings on the Trustees' application were held on April 20 and 23, 1971. The State of New Jersey did not participate in those hearings. By Order No. 238, entered on April 27, 1971, this Court approved the Amtrak contract.

Thereafter, on August 28, 1971, a hearing was held on the Trustees' application for leave to discontinue intercity passenger service. The State of New Jersey appeared at that hearing, and did not object to the proposed discontinuance of the trains in the 200 series, nor did it raise any question concerning those trains. Counsel for the State of New Jersey merely sought clarification of the status of four trains, which he was then unable to identify. He was afforded an opportunity to advise the Court and the parties just which trains he was concerned about, and did so (they were trains Nos. 22 and 23, operating between New York City and Chicago; and Nos. 176 and 177, operating between Boston and Washington, D. C.).

Order No. 244 referred the status of, *inter alia,* the 200 series of trains, to the ICC for recommendation and report; and Order No. 245 authorized the discontinuance of intercity rail service with certain exceptions therein stated. With respect to the 200 series, Order No. 245 required the Trustees to resume their operation, in the event Amtrak should discontinue them, pending final action on the ICC report. The State of New Jersey joined in consolidated appeals from both of those orders.

At the ICC hearings, New Jersey apparently took the position, for the first time, that the 200 series of trains should be regarded as "commuter." After the ICC report was filed, the Commonwealth of Pennsylvania and various other parties filed Civil Action No. 71–2301, seeking "enforcement" of the ICC "orders." Eventually, the State of New Jersey sought leave to intervene as a party plaintiff, and to file its own complaint, in that action. Intervention was sought on or about December 27, 1971. The other plaintiffs in that case consented to the intervention, the defendants opposed it. On February 14, 1972, this Court entered an Order permitting the intervention sought.

The complaint filed by the State of New Jersey in Civil Action No. 71–2301 is a prolix and somewhat confusing document. But for the fact that it includes a prayer for general relief, the entire thrust of the complaint is addressed to preventing Amtrak from operating the 200 series of trains, and requiring the Trustees to operate them, on the theory that they are "commuter" in nature. In that complaint, the State of New Jersey asserted for the first time that implementation of the Amtrak contract, with respect to the 200 series of trains, would be in derogation of New Jersey's rights under an earlier contract between the State of New Jersey and the Trustees. Motions to dismiss were filed by all of the defendants.

It is interesting to note that, in resisting the defendants' attempts to prevent late joinder in the action, and in resisting the defendants' motions to dismiss, New Jersey appeared to argue that it was merely echoing the arguments already presented by the Commonwealth of Pennsylvania and the other plaintiffs, and therefore that its delay was of no significance. However, its brief also contains arguments, not clearly articulated, to the effect that implementation of the Amtrak contract amounted to a breach of the Trustees' earlier agreement with the State of New Jersey.

To the extent that the State of New Jersey seeks merely to prevent Amtrak from operating the 200 series of trains, I conclude, for the reasons stated earlier in this Opinion, that this Court is precluded from considering the matter. And it may be that that is the only relief actually being sought by New Jersey.

It is, however, arguable that the Amtrak statute does not provide a basis for precluding New Jersey from attempting to secure other forms of relief from the Trustees. But to the extent that any such cause of action is premised upon the implementation of the Trustees' contract with Amtrak, I hold that any such cause of action is barred by *res judicata*. The State of New Jersey had an opportunity to object to the Amtrak contract for any and all of the reasons now asserted. By failing to oppose or to appeal from Order No. 238, New Jersey is now precluded from asserting that its rights under its earlier contract have been improperly abridged by reason of the Amtrak arrangement.

Because these claims are barred, I find it unnecessary to consider the Trustees' challenge to the continuing efficacy of the earlier contract.

## VI.

In conformity with the views expressed in this Opinion, appropriate orders will be entered dismissing the plenary actions, vacating the injunctive provisions of Order No. 245 (except for the York to Lancaster substituted bus-for-rail service), and declaring that the Chatham, New York to New York City trains are "intercity" and were properly discontinued by the Trustees pursuant to the Amtrak statute.